UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID SCHEWITZ, M.D., | |
| Plaintiff, | Case No. 18-cv-6119 |
| v. | Judge John Robert Blakey |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff David Schewitz, a physician who practiced in the Chicago area prior to becoming disabled, sues Defendant Aetna Life Insurance Company to recover certain disability benefits he claims Defendant denies him. Plaintiff sues under ERISA, which allows him to challenge Defendant's denial in federal court. 29 U.S.C. § 1132. The parties cross-move for summary judgment as to Plaintiff's entitlement to benefits. [21] [24]. For the reasons explained below, this Court grants Plaintiff's motion [24] and denies Defendant's motion [21].

**I.   Background**

The facts in this section come from Defendant's statement of undisputed facts [23] and Plaintiff's statement of undisputed facts [26].

**A.   The Parties**

Plaintiff is a physician licensed to practice in the State of Illinois. [26] ¶ 1. Non-party NorthShore University HealthSystem (NorthShore) employed Plaintiff as

an obstetrician-gynecologist pursuant to an employment agreement (the Agreement).

[23] ¶ 2. The Agreement, effective as of December 1, 2012, had an initial five-year term (the Initial Term). [26] ¶ 7.

Addendum A of the Agreement set forth the terms of Plaintiff's base salary, providing, in pertinent part:

> As compensation for the professional, teaching, research, administrative and other services to be provided by [Plaintiff] under the Agreement, [NorthShore] shall pay [Plaintiff] an annual amount (the "Base Salary"), provided that [Plaintiff] meets the expectations described in the Agreement. . . .
>
> a. **Years One and Two Of the Initial Term**. During each of the first two (2) years of the Initial Term, [Plaintiff's] Base Salary shall equal Three Hundred Twenty-Two Thousand Six Hundred Eighty-Nine and 00/100 Dollars ($322,689.00) (the "Initial Base Salary").
>
> b. **Years Three Through Five of the Initial Term**. During the three (3)-year period effective December 1, 2014 through November 30, 2017, the Base Salary shall be at least the amount of the Initial Base Salary, provided that [Plaintiff] meets the expectations described in the Agreement and during such three (3)-year period, the aggregate wRVUs for each year are at least 5,893 wRVUs ("Baseline Productivity"), which is equal to ninety percent (90%) of the 6,548 wRVUs reported to NorthShore by the Practice for the baseline period.
> If [Plaintiff's] productivity is less than one-fourth (1/4) of Baseline Productivity, which equals 1,473 wRVUs ("Quarterly Baseline"), during any quarter in years three (3) through five (5) of the Initial Term (each a "Deficit Quarter"), [Plaintiff's] Base Salary for such Deficit Quarter will be recalculated in accordance with the Model [in Addendum B].

[23] ¶ 14. Addendum B to the Agreement provides that the "calculation for a particular quarter shall be determined as of the last day of that quarter." *Id.* ¶ 15.

**B.  The Plan**

While employed by NorthShore, Plaintiff participated in NorthShore's employee welfare benefit plan—the "Employee Long-Term Disability Plan" (the

Plan). *Id.* ¶ 3. The Employee Retirement Income Security Act of 1974 (ERISA) governs the Plan, and Defendant's Policy No. GP-659115-GI (the Policy) insures the Plan. *Id.* The Plan designates Defendant as the named fiduciary for adjudicating claims for benefits under the Plan and for deciding appeals of denied claims. [26] ¶ 13.

Under the Plan, long-term disability benefits pay out on a monthly basis. [23] ¶ 7. The Plan further provides: "The benefit amount is based on [the plan participant's] predisability earnings, up to the maximum monthly benefit shown in the Schedule of Benefits." *Id.*

The Plan supplies the method for calculating long term disability benefits:

To calculate your monthly long term disability benefit, multiply:
- Your Monthly predisability earnings; times
- The Benefit Percentage shown in the Schedule of Benefits.

The LTD benefit payable will be the lesser of:
- The monthly LTD benefit; and
- The maximum monthly benefit.

*Id.* ¶ 8.

The Plan defines "predisability earnings" as the "amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability started, calculated on a monthly basis." *Id.* ¶ 9; [26] ¶ 16.

The Plan further states, in relevant part: "Your predisability earnings will be figured from the rule below that applies to you. . . . If you are paid on an annual contract basis, your monthly salary is based on your annual contract divided by 12. . . ." [23] ¶ 10. And, the Schedule of Benefits states that the "Scheduled Monthly Benefit" is "60% of your monthly predisability earnings." *Id.* ¶ 11.

## B. NorthShore Prematurely Reduces Plaintiff's Salary

Consistent with the Agreement's terms, Plaintiff received his annual salary of $322,689 for the first two years of the Initial Term: December 1, 2012 through December 1, 2014. [26] ¶ 18.

The parties concur that the Agreement does not permit NorthShore to recalculate Plaintiff's salary on the first day of the third year of his Initial term. *Id.* ¶ 21. The parties also agree that the Agreement does not let NorthShore adjust Plaintiff's salary based upon his productivity during the second year of his Initial Term. *Id.* ¶ 22.

Yet, on December 1, 2014, NorthShore reduced Plaintiff's salary to $156,011 based upon purported deficient productivity during the previous year. *Id.* ¶ 20. In January 2015, NorthShore's CFO sent Plaintiff a letter, informing Plaintiff about the salary reduction, and explaining that NorthShore based the reduction "on the data in the twelve-month period beginning on December 1, 2013 and ending on November 30, 2014." [23] ¶ 19.

The CFO further recalled in the letter that:

> During the meeting between you and me late last year, it was discussed that the best thing to do would be to try to alleviate any impact the salary changes may have by setting your salary in accordance with the Primary Care Physician Group Compensation Model . . . as of December 1, 2014.

*Id.* ¶ 20. The letter then notes: "However, as [Plaintiff] indicated in our meeting . . . on December 30, 2014, rather than having your salary adjusted as described above, you [Plaintiff] would prefer to maintain your initial annual salary rate of $322,689 through February 28, 2015." *Id.* ¶ 21.

4

The letter then states:

> Going forward, your salary and production will continue to be evaluated on a quarterly basis pursuant to Section 1.b of your Agreement. In the event your aggregate wRVU production from December 1, 2014 through February 28, 2015 is less than one-fourth of the aggregate wRVU target of 5,893 (or 1,473 aggregate wRVUs per quarter), this would be considered a "deficit quarter" and your base salary will be reset according to the Model as soon as administratively possible following the end of that quarter (February 28, 2015). Additionally, any overage paid to you during the deficit quarter will be withheld from your base salary until such overage is satisfied. Thus, you may have checks which are for $0 or deficit paychecks.

*Id.* ¶ 22. The letter then provides two options to Plaintiff:

> By making a selection below, you are either selecting option 1, which would maintain your reduced salary at $156,011 annually, or option 2, which would retroactively increase your annual salary to $322,689 effective December 1, 2014 through February 28, 2015. Beginning March 1, 2015 your salary will be reduced in accordance with your contract. Thus, Option 2 leads to a large overpayment being deducted from the lower annual salary, and therefore during the months of repayment of March, April and May 2015 your checks will likely be close to $0 or even a deficit.

*Id.* ¶ 23. Plaintiff chose option 2 and signed below the following language in January 2015:

> Option 2: Increase salary to $322,689.00 retroactive to December 1, 2014, through February 28, 2015. Should work RVU's for the quarter equal less than 1,473, salary will be reduced in accordance with the Model effective March 1, 2015, with repayment for the overpayment from December 1, 2014 through February 28, 2015 during March, April and May 2015.

*Id.* ¶ 24.

### C. Plaintiff Commences Disability Leave

Due to a serious eye injury requiring surgery, Plaintiff took short-term disability status on February 4, 2015. [26] ¶ 32. That same month, Plaintiff wrote

5

NorthShore a letter, notifying NorthShore he had not been paid the base salary of $322,689 since December 1, 2014, despite his election of Option 2. [23] ¶ 27. Subsequently, in March 2015, NorthShore paid Plaintiff the difference between the base salary of $322,689 and the salary of $156,011 for the period December 1, 2014 through February 28, 2015. *Id.* ¶ 28.

Plaintiff commenced long-term disability on August 2, 2015, due to vision loss, a retinal tear in both eyes, and a right macular hole in his right eye. [26] ¶ 33.

On August 12, 2015, NorthShore's Human Resources informed Defendant that Plaintiff's salary was reduced to $156,011 "on 12/1/14 to reflect his productivity," Plaintiff's "base salary was then reset to [$]323,689 on 2/27/15 per his request, but since he was not entitled to this pay amount . . . the higher salary is not reflective of his actual salary at the time of leave." [23] ¶ 31. NorthShore then reiterated in a letter to Plaintiff dated November 23, 2015, that "the salary calculation of $171,765 was determined to be correct effective December 1, 2014 based on the language of [Plaintiff's] employment agreement." *Id.* ¶ 32.

Four months later, in December 2015, Defendant wrote Plaintiff regarding his long-term disability benefit, stating that based upon its review, his benefit would be based upon the salary of $171,765, not $322,689. *Id.* ¶ 34. In June 2016, Plaintiff appealed Defendant's decision; in September 2016, Defendant denied Plaintiff's appeal. *Id.* ¶¶ 36, 37.

## II. Legal Standard

### A. Summary Judgment

Summary judgment is proper where there is "no dispute as to any material fact

6

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Cross-motions for summary judgment "do not waive the right to trial;" rather, this Court "treats the motions separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 438–39 (7th Cir. 2011).

**B.      ERISA**

ERISA authorizes participants of employee benefit plans to sue to recover benefits due under the terms of those plans. *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 886 (7th Cir. 2015) (citing 29 U.S.C. § 1132(a)(1)(B)). Courts review a denial of benefits challenge under ERISA *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Black v. Long Term Disability Ins.*, 582 F.3d 738, 743 (7th Cir. 2009). The parties agree that the *de novo* standard applies in this case. [22] at 8; [25] at 4. This Court thus accepts that standard. *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 842 (7th Cir. 2009) (if parties agree to accept the *de novo* standard, courts "will not look behind that agreement.").

Under the *de novo* standard, district courts do not actually "review[ ] anything." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007).

7

Rather, this Court must make an "independent decision" about an employee's entitlement to benefits and come to an "independent decision" on both the legal and factual issues presented. *Id.* What happened before the Plan administrator or ERISA fiduciary has no relevance; this Court's ultimate determination remains whether the Plan entitled the employee to the benefits he sought. *Id.*

**III.    Analysis**

Plaintiff claims that Defendant incorrectly bases his long-term disability benefits upon a reduced salary, rather than on his initial salary of $322,789. [1]. The parties cross-move for summary judgment on Plaintiff's claim under 29 U.S.C. § 1132(a)(B)(1) to recover benefits to which he claims entitlement. The parties' dispute requires this Court to interpret the documents governing Plaintiff's claimed benefits.

In making this determination, this Court looks to federal common law rules governing contract interpretation. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005). Under federal common law, this Court must give an ERISA plan its "plain and ordinary meaning," and construe it "as a whole, considering separate provisions in light of one another and in the context of the entire agreement." *Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018) (quoting *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012)). Unless a document governing an ERISA plan presents an ambiguity, courts do not look beyond its four corners in interpreting its meaning. *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001).

## A. Plaintiff's Correct Predisability Earnings

This Court's analysis begins with the Agreement and Plan, which the parties agree govern here.

The Plan defines predisability earnings as "the amount of salary or wage you were receiving from an employer participating in the plan on the day before a period of disability started, calculated on a monthly basis." [26] ¶ 16. The parties do not dispute that Plaintiff took disability status starting on February 4, 2015, *id.* ¶ 32, and thus that his predisability earnings should be calculated based upon his salary as of February 3, 2015, *see* [22] at 10–11; [25] at 5.

The parties do dispute, however, what that salary should be. The Agreement between Plaintiff and NorthShore, which supplies the parameters of Plaintiffs' compensation, sets forth a five-year Initial Term, starting December 1, 2012. [26] ¶ 7. The Agreement then provides:

> a. **Years One and Two Of the Initial Term**. During each of the first two (2) years of the Initial Term, [Plaintiff's] Base Salary shall equal Three Hundred Twenty-Two Thousand Six Hundred Eighty-Nine and 00/100 Dollars ($322,689.00) (the "Initial Base Salary").
>
> b. **Years Three Through Five of the Initial Term**. During the three (3)-year period effective December 1, 2014 through November 30, 2017, the Base Salary shall be at least the amount of the Initial Base Salary, provided that [Plaintiff] meets the expectations described in the Agreement and during such three (3)-year period, the aggregate wRVUs for each year are at least 5,893 wRVUs ("Baseline Productivity"), which is equal to ninety percent (90%) of the 6,548 wRVUs reported to NorthShore by the Practice for the baseline period. If [Plaintiff's] productivity is less than one-fourth (1/4) of Baseline Productivity, which equals 1,473 wRVUs ("Quarterly Baseline"), during any quarter in years three (3) through five (5) of the Initial Term (each a "Deficit Quarter"), [Plaintiff's] Base Salary for such Deficit Quarter will be recalculated in accordance with the Model [in Addendum B].

9

[23] ¶ 14.

The Agreement thus guaranteed Plaintiff a salary equal to $322,689 for the first two years of his Initial Term: December 1, 2012 through November 30, 2014. The Agreement also provided that, for the next three years—December 1, 2014 through November 30, 2017—Plaintiff would maintain his initial salary of $322,689, subject to reduction if he failed to meet certain productivity measures.

Critically, the Agreement entitled Plaintiff to maintain his initial salary of $322,689 through at least the first quarter of the third year of the Initial Term: it states that NorthShore may recalculate Plaintiff's salary only if his productivity dipped during any quarter *in those latter three years*. See id. ("If [Plaintiff's] productivity [falls below the baseline measure] during any quarter in years three (3) through five (5) of the Initial Term (each a "Deficit Quarter"), [Plaintiff's] Base Salary for such Deficit Quarter will be recalculated."). Accordingly, under the Agreement's unambiguous terms, (1) Plaintiff's salary remained $322,689 through February 28, 2015; and (2) the earliest date on which NorthShore could reduce Plaintiff's salary was March 1, 2015, the first day following the first quarter of the Initial Term's third year.

Because Plaintiff's predisability earnings must be calculated based upon his salary as of February 3, 2015, a date before March 1, 2015, those predisability benefits should be based upon his initial salary of $322,689.

### C. Defendant's Arguments Must Be Rejected

Defendant contends that Plaintiff's salary as of February 3, 2015 amounted to $171,765. [22] at 11. Defendant fails to justify why that figure is correct; instead,

10

Defendant argues that that figure is correct merely because NorthShore said so. *Id.*; [34] at 10–11 (arguing the "only common sense interpretation here is that Plaintiff's [predisability earnings] could only be determined based on NorthShore's ultimate calculation of Plaintiff's salary in effect as of December 1, 2014, which was $171,765."); [36] at 7 (explaining that NorthShore "confirmed" to Aetna that $171,765 is the correct salary).

This Court rejects Defendant's argument for two reasons. First, the Agreement directly contradicts that theory because, as described above, it does not permit NorthShore to reduce Plaintiff's salary from $322,689 until March 1, 2015. Second, under *de novo* review, this Court makes an independent determination as to Plaintiff's entitlement to benefits. *Walsh v. Long Term Disability Coverage for All Employees Located in the United States of DeVry, Inc.*, 601 F. Supp. 2d 1035, 1043 (N.D. Ill. 2009 (under *de novo* review, the plan administrator's decision has already been set aside, and the plaintiff receives a "fresh opportunity" to prove entitlement to benefits). Thus, this Court focuses only upon whether the Agreement and Plan entitle Plaintiff to the benefits he seeks; whatever amount Defendant (or NorthShore) deemed correct remains irrelevant to this Court's analysis. *Diaz*, 499 F.3d at 643.

Defendant also contends that Plaintiff "did not have a reasonable expectation" that his benefits would be based upon the initial $322,689 salary, citing correspondence between NorthShore and Plaintiff, in which NorthShore discussed reducing Plaintiff's salary as of December 1, 2014. [36] at 2–3. To be sure, courts should interpret and enforce ERISA-governed documents with the end goal of

11

maintaining employees' reasonable expectations to coverage. *Cheney v. Standard Ins. Co.*, 831 F.3d 445, 453 (7th Cir. 2016).

But the record contains no evidence that Plaintiff reasonably expected less than his $322,689 salary through February 28, 2015. Rather, the January 2015 correspondence between Plaintiff and NorthShore only confirms that the parties understood the Agreement required NorthShore to maintain Plaintiff's initial base salary until March 1, 2015. In the January 2015 letter, NorthShore notes Plaintiff's desire to "maintain [his] initial annual salary rate of $322,689 though February 28, 2015," [23] ¶ 21; it then reaffirms that "[b]eginning March 1, 2015 your salary will be reduced in accordance with your contract," *id.* ¶ 23. Plaintiff then confirmed that he expected NorthShore to retroactively credit him his correct salary of $322,689 for the period of December 1, 2014 through February 28, 2015, when he wrote back to NorthShore and signed under this option:

> Option 2: Increase salary to $322,689.00 retroactive to December 1, 2014, through February 28, 2015. Should work RVU's for the quarter equal less than 1,473, salary will be reduced in accordance with the Model effective March 1, 2015, with repayment for the overpayment from December 1, 2014 through February 28, 2015 during March, April and May 2015.

*Id.* ¶ 24.

The correspondence between the parties thus confirms that NorthShore and Plaintiff both understood—and thus, reasonably expected—that the Agreement entitled Plaintiff to his initial $322,689 salary through February 28, 2015.

In short, the Agreement plainly entitled Plaintiff to his initial base salary until at least February 28, 2015. Plaintiff's long-term disability benefits, assessed as of

12

February 3, 2015, must be based upon that initial salary of $322,689. NorthShore improperly reduced Plaintiff's salary, and Defendant relied upon NorthShore's premature reduction in denying Plaintiff's claim to his correctly calculated long-term disability benefits. This Court thus grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment.

## IV. Conclusion

For the reasons explained above, this Court grants Plaintiff's motion for summary judgment [24] and denies Defendant's motion for summary judgment [21]. Plaintiff is entitled to monthly long-term disability benefits based upon his initial $322,689 salary for the remainder of the benefit period, as set forth in the Plan. Plaintiff is also entitled to back pay of benefits, calculated as the difference between the reduced benefits Defendant already issued and the amount Plaintiff should have received if Defendant had correctly calculated his benefits based upon the $322,689 salary.

Judgment will enter in Plaintiff's favor after the parties submit a status report setting forth the correct calculations for Plaintiff's back payments and prejudgment interest. *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 819–20 (7th Cir. 2002) (holding that prejudgment interest is presumptively appropriate in ERISA cases). The parties shall meet and confer and file that status report within 14 days of this order.

Plaintiff shall additionally comply with Local Rules 54.1 and 54.3 on his petitions for costs and fees. All other dates and deadlines are stricken. Civil case terminated.

Dated: May 21, 2019

Entered:

_____
John Robert Blakey
United States District Judge